### THOMSON-HOUSTON ELECTRIC CO. v. LORAIN STEEL CO.

(Circuit Court of Appeals, Second Circuit. May 29, 1902.)

#### No. 126.

1. PATENTS—VALIDITY—PRIOR PUBLIC USE.

The use of an invention by a subsequent patentee, with the knowledge of the public, more than two years before the filing of his application, renders the patent void for prior public use, unless it is shown by proof that is full, unequivocal, and convincing that such use was experimental for the purpose of perfecting the device; the fact alone that the use was by the inventor himself and without profit does not prevent it from being a bar to a patent.

2. SAME.

The patentee of a commutator brush for use on electric motors, more than two years prior to his application for a patent, used a brush having the essential features of that described in the patent on a motor used to propel a car or carrier with which he was experimenting, and which was run at intervals during several months along a cable stretched over a vacant lot adjoining his factory in a city, and was exhibited to visitors. *Held*, that the fact that the use of the car was experimental did not impart such character to the use of the brush, which was a separate, completed, and successfully operating invention, and that such use was a practical public use, which rendered the patent invalid.

3. SAME—INVENTION—CONTEMPORANEOUS IMPROVEMENT OF DEVICE.

Where a number of workers in the same field, when confronted by an obstacle to the development of a device, naturally, and practically contemporaneously, independently substitute one well-known material for another, and, finding that it successfully overcomes such obstacle, use it publicly and privately without any claim of exclusive right, the presumption is raised that they rightly regard the substitution as a mere improvement or a mere choice of materials, such as would be made by a skilled workman, which does not involve invention.

4. SAME—PRIOR USE—COMMUTATOR BRUSHES.

The Van Depoele patent, No. 390,921, for an improvement in commutator brushes or contacts, the essential feature of which is the use of carbon as the material for such brushes, is void for prior public use, if there was in fact patentable invention involved in the substitution of carbon for the copper brushes previously used.

Appeal from the Circuit Court of the United States for the Southern District of New York.

For opinion below, see 110 Fed. 654.

This cause comes here upon an appeal of the complainant in the court below from a decree of the United States circuit court for the Southern dis-

trict of New York, dismissing the bill alleging infringement of the first claim of patent No. 390,921, issued to Charles J. Van Depoele, October 9, 1888, for a carbon contact or commutator brush. The following citations from the patent in suit, and discussion of certain defenses contained in the opinion of the court below, sufficiently and accurately explain the character of the alleged invention:

"The specification states that the 'invention relates to improvements in commutator brushes or contacts for use with dynamo-electric generators and electric-dynamic motors. In the operation of electric motors it is desirable for various reasons to use a thick brush or contact held by suitable mechanism in position tangential to the surface of the commutator; that is, projected endwise against it. [Concededly the word "tangential" is a misuse for "radially," which the context shows was intended.] In these positions the brush may be moved around the commutator to any desired position without in the least affecting their mechanical relation thereto, and it has been usual to use thick bunches of thin copper laminæ secured together at their outer ends for this purpose; but I find in practice that the leaves of brushes so constructed will get into the interstices or separations between the sections of the commutator, by the rotation of which the leaves of which the brush is composed will be gradually bent outward and away from each other, and so in a short time rendered useless. This difficulty I have overcome by substituting for the copper contact brushes, heretofore used, brushes or contacts of carbon or other nonhomogenous substance, being porous, 'will in a short time take up a quantity of copper dust, and form a smooth wearing surface that is extremely durable.' After a reference to the drawings the specification proceeds: 'My improved brushes consist of plates or pieces of carbon shaped to fit loosely within the boxes or holders where they are placed, and then securely held in position against the commutator by the tension of suitable springs, to be referred to. The carbon brushes or contacts, A, may be of any desirable length, or shape according to circumstances, the particular shape and size or proportion herein shown being merely for the sake of illustration. The lower ends of the brushes should be formed or molded to fit the surface of the commutator, the subsequent wear being sufficient to retain the shape originally given.' After setting forth the details of the boxes, or holders with their springs, etc., the specification concludes: 'In order to reduce the resistance of the carbon brush to the minimum, the boxes, CC', are brought down very close to the surface of the commutator, and should the small resistance then remaining be a disadvantage the brushes themselves can be plated with a good conductor, and all objection thus removed. I do not limit myself to the use of carbon alone, as any nonhomogenous or porous hard conducting substance will answer the purpose and come within the scope of my invention.'

"The first claim alleged to'be infringed is: '(1) The combination, with a commutator cylinder formed of separated insulated segments, of commutator brushes bearing upon the surface thereof and formed of carbon or other similar unyielding material, and of a width greater than the distances between the commutator segments, substantially as described.' Four other claims, not alleged to be infringed, deal with details of holders, springs, etc. The only one in controversy here is the first or broad claim for the use of 'carbon' as a commutator brush.

"In view of the conclusion which has been reached, it will be necessary merely to allude briefly to some of the arguments which have been advanced on behalf of the defendant. It is contended that the patent should be construed as calling for some peculiar kind of carbon, which will hold copper dust as felt does rouge. This seems to be a very strained construction. Van Depoele, anxious to cover all possible equivalents, announced his invention as covering other unyielding material,—'any nonhomogenous or porous hard conducting substance,'—but apparently he didn't know any of them, other than carbon, nor, so far as the record shows, has any since been found. He found that the hard, brittle carbon of the art would, in operation, 'form a smooth wearing face that is extremely durable.' He had the idea that in some way or other this effect was obtained by copper dust worn off the commutator and taken up by the pores of the carbon. It makes no differ-

ence whether this idea of Van Depoele was correct or not; he has not made it a part of his invention. 'Carbon' is a broad word. It may be used to include a diamond or soot, but, according to all the canons of patent construction, it must be taken here as meaning the carbon known at the time to electricians under that name,—the ordinary carbon of the art, such as was employed for the pencils of arc lamps, for battery plates, for rheostats or artificial resistances, and other similar electrical purposes. It was made up of some variety of coke either from petroleum or bituminous coal, the structure of the material being agglomerate; that is, it is practically numerous particles cemented together, leaving pores between the particles, but not large openings. The improvement of the patent may be obtained by the use of just such carbon pencils or blocks, and, inasmuch as the inventor does not indicate that the functions discharged by the new brush are to be secured by the use of some peculiar variety of carbon not then used in the electrical art, there is no ground for thus confining his patent."

The court reached the conclusion that the patentee made an open and public use, not experimental, of carbon brushes on a motor in what was known as the "telpher" system, for more than two years prior to his application for the patent, and on this ground dismissed the bill.

Thos. B. Kerr and Fredk. P. Fish, for appellant.

Richard Eyre and John R. Bennett, for appellee.

Before WALLACE and TOWNSEND, Circuit Judges.

TOWNSEND, Circuit Judge (after stating the facts). Counsel for complainant has critically analyzed the testimony, and contends that the conclusion of the circuit court is erroneous and contrary to the weight of evidence. This contention has been carefully considered. As the court says of some of the testimony: "It is somewhat unsatisfactory, being individual recollections of long-past dates unchecked by any record evidence." But this is the necessary or natural result of a failure on the part of the complainant to assert its rights under this patent until some 10 years after the occurrence of the events now relied upon to establish validity.

Crot, on whom complainants rely to support the claimed 1885 date of the outside telpher use, contradicts himself as to the date of his employment, at this critical period, to the extent of six months, and asserts in one suit that he had never used carbon brushes before July, 1885, and in the other suit that he had used them between March and May, 1884. On the other hand, five of defendant's witnesses, and two of complainant's witnesses called by defendant, fix the date of installation of the telpher plant in 1883 or 1884. It is clear, upon an examination of the whole evidence, that the date of installation was, as found by the court below, prior to February 5, 1885.

A complicated question is raised by the evidence as to the character of the outside use. Van Depoele conceived the idea that by means of a car suspended on an overhead cable ore might be carried from one mountain top to another, and for the purpose of testing the practicability of this idea he caused such a line to be constructed from the factory of the Van Depoele Company across a lot, and equipped it with ordinary copper brushes, and with a device for reversing the direction of the motor so that the car might make the trip from one street to another and return to the starting point. When it was

first started the reversing apparatus bent the brushes so that they would not work. The next day Van Depoele substituted two ordinary electric light carbons, and thereafter the car was run for four or five weeks, whenever Van Depoele wished to show it to customers or to experiment with it. The system remained there from six months to a year and a half. Van Depoele did not part with his control over the system or receive any pay for running it. The court below found as follows:

"There is no dispute on the proof as to what its use was. As a system for overhead electrical transportation, it was experimental, but as a use of carbon brushes in combination with a segmental commutator on an electric motor it was a substantial public use."

Counsel for complainant contends that no public use can be a bar to a patent unless there is an element of profit involved or unless the inventor allows the invention to go out of his control. The object of evidence on these points is to distinguish between a use by the public, as in Elizabeth v. Pavement Co., 97 U. S. 126, 24 L. Ed. 1000, for the purpose of experiment, and a use by any part of the public, as in Egbert v. Lippmann, 104 U. S. 333, 26 L. Ed. 755, which is not experimental. The ultimate question is not whether the public used the invention, but whether the use was directed to a development of the invention or test of its practicability. For the purpose of proving the ultimate fact, evidence as to whether the inventor derived a profit from the use or retained control may be important, but it is not necessarily conclusive. But, where a use known to the public is shown, the proof on the part of a patentee who contends that it is not a bar, "because it was for the purpose of perfecting an incomplete invention by tests and experiments, * * * should be full, unequivocal, and convincing." Manufacturing Co. v. Sprague, 123 U. S. 249, 264, 8 Sup. Ct. 122, 31 L. Ed. 141.

The telpherage system as a whole was put up as an experiment, not for practical utility or commercial purposes. But there is no evidence whatever that the use of the carbon brushes was experimental. As already stated, Van Depoele caused the carbons to be put in as soon as he found that the copper brushes failed to work satisfactorily. It does not appear that there was any question as to their operativeness or that they were ever examined or tested.

If there were otherwise any doubt as to whether this was a nonexperimental use, it would be resolved in favor of defendant by the testimony of complainant's witnesses. Van Hoogstrate, one of Van Depoele's employés, testifies that Van Depoele understood the adaptability of carbon brushes for electrical motors where a reversal was desirable in 1883, and describes an experimental use at that time. Jannus, Van Depoele's patent solicitor, testifies that in 1883 Van Depoele told him he had ascertained by trial that pieces of carbon would answer very well in such cases, and that Van Depoele then understood that mechanical and electrical questions were involved in the success of such brushes. Long prior to this date Van Depoele had successfully used carbon brushes for various purposes. There was therefore no reason for further experiment.

Furthermore, the testimony as to the inside or shop telpher use

in 1884 is practically uncontradicted. The telpher was a small working model substantially like the outside telpher. It was constructed and operated in 1884, and was publicly exhibited to prospective customers and to large delegations of people. Two witnesses testify that it was equipped with carbon brushes. One witness testifies, "I should think they were copper." Although this successful public use occurred in the Van Depoele factory, no witnesses were produced by complainant to show that the brushes were not of carbon or that their use was experimental. Inasmuch as the burden of proof on the latter point was on complainant, and in view of the confessed use of carbon brushes on the outside telpher, this use in the shop must also be considered as proved to be a public one.

This test of the practicability of the proposed ore-carrier system between mountain tops cannot impart the experimental character of its use to a distinct, completed, successfully operating invention, which is a part of said system. Manufacturing Co. v. Sprague, supra.

The other evidence in the case also strongly supports the conclusion of the circuit court. Van Depoele successfully used carbon brushes as early as 1881, and he then said he had used them before. Thereafter he applied for various other patents involving similar devices, but he did not refer to the carbon brush or attempt to patent it till 1887. Meanwhile it had been practically used by him and others in public and private without any claim on the part of any one except Forbes, the English patentee, that such use involved invention. The patent finally issued in 1888, but although carbon brushes were openly and exclusively used by rival manufacturers no right was asserted by Van Depoele during his life nor thereafter by this complainant until 1895, and even then suit was brought both on the Van Depoele and Forbes patents, and it was alleged that Forbes was the original inventor of the devices patented by him, and which cover all that Van Depoele is now claimed to have invented. It was not until this suit was brought, in 1899, that the priority of Van Depoele over Forbes was asserted. As a part of the evidence in support of that assertion the telpher use was shown. As complainant's expert, quoted in the opinion of the court below, says: "It was a practical use of the invention, since the motor was used occasionally to propel the car in connection with the experiments on the cable system, which the apparatus was intended to embody."

In this connection the adverse public uses are material, irrespective of whether such uses occurred more than two years prior to the date of Van Depoele's application. The evidence shows that long prior to his application other workers in this field and in various localities had publicly and successfully used carbon brushes for various purposes, but without claiming any patentable novelty in such use. Randall, in his patent of 1880, had described the use of carbon contacts as interchangeable with metal contacts.

Where, of a number of independent inventors working in the same field, one takes the last step which accomplishes the result sought, a strong presumption of invention is raised in his favor. But where a number of workers in a single field, when confronted by an obstacle

to the development of a device, naturally, and practically contemporaneously, independently substitute one well-known material for another, and, finding that it successfully overcomes such obstacle, use it publicly and privately without any claim of exclusive right, the presumption is raised that such workers rightly regarded the substitution as a mere improvement, a mere choice of material such as would be adopted or selected by the skilled workman, or a double use. Van Depoele's conduct shows that he too considered that he had not made any invention; that he found the tool ready to his hand, requiring no adaptation to fit it for the new use.

It is unnecessary to consider the confessedly great advantages derived from the use of the carbon brush as a result of the experiments in 1888 and thereafter, or the contention that these are due to the comparatively poor conductivity of carbon, which Van Depoele considered an objection and tried to obviate, or whether the doctrine that an inventor is entitled to all the beneficial uses of his invention should be extended to cover a new, original use discovered by others and unknown to him. These questions relate to occurrences long after the period when Van Depoele, familiar with the use of the carbon brush in place of the copper brush, had abandoned it to the public without reservation or claim. Thereafter the public, through him and other users and the Forbes patent, had acquired full knowledge of such use, and had practiced the same, and intervening rights had arisen.

The sole explanation offered by complainant of Van Depoele's long delay in asserting his rights is the usual one that he was experimenting and perfecting his invention; and this is not sustained by the evidence. The carbon brush worked as long as it was needed in 1881; that it would work when reversed Van Depoele had ascertained by trial prior to September, 1883. The evidence of investigations to meet the difficulty experienced with uninsulated segments is argumentative and inferential, and rests largely on the statement in the claim of the patent that the commutators should be "formed of separated insulated segments." But this statement was made in 1887, and the omission of all references to carbon brushes in his patents of 1884 and 1886 are quite as forcibly suggestive of his abandonment of them, especially when coupled with attempts to use the carbons, which had resulted in failure, and the public uses already shown.

That the disclosure of the invention was complete is shown by the statement that a carbon brush would obviate certain objections to the copper brush. Thus, speaking of said 1881 successful use, complainant's witness Verstraete says: "The brush-holder had a large opening that you could slip in a carbon used for electric purpose and rest on the commutator in the same position as the copper brush was before."

From a study of the whole case, the conclusion is irresistible that Van Depoele, during the period prior to February 5, 1885, used, but saw no reason to assert any exclusive right to the use of, carbon brushes in the combination afterwards claimed.

The decree is affirmed.