## PICARD v. UNITED AIRCRAFT CORPORATION.

### No. 244.

Circuit Court of Appeals, Second Circuit.

May 28, 1942.

Raymond L. Greist, of Chicago, Ill., and Stephen J. Cox, of New York City, for plaintiff.

C. Blake Townsend and Drury W. Cooper, both of New York City, for the defendant.

Before L. HAND, SWAN, and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

Both parties appeal from a judgment in an action to enjoin infringement of claims 2, 3, 4, 5, 11, 14, 15, 16, 17, 18, 19 and 20 of Reissue Patent No. 21,031, originally issued on July 21, 1931, to Martin J. Schenk (No. 1,815,868), the reissue being granted on March 14, 1939. The district judge held claims 4 and 14—original claims—valid and infringed; he held claims 2, 3, 5, 11, 15 and 16—likewise original claims —not infringed; and he held claims 17, 18, 19 and 20—reissue claims—invalid because broadened over the original claims, and also because of laches in the application. Each side appealed from so much of the judgment as went against it. In the view we take, it will not be necessary to pass upon the plaintiff's appeal, because we

634

think that the claims in suit are all invalid for lack of invention.

The patent was for a lubricating and cooling system for "radial" air-cooled combustion engines, and was primarily, if not exclusively, intended for aeroplanes. "Radial" engines are like ordinary combustion engines except for location of the cylinders as to the driving shaft, which in ordinary engines are either set "in line" or in a V—two parallel lines inclined to each other. In a "radial" engine the cylinders are set around the driving shaft like the spokes of a wheel—ordinarily nine in number, and it follows that some of them are vertical—heading up or down—some incline upwards, some are horizontal and some incline downwards. The train of elements in the patent-in-suit which operate, the poppet valves in each cylinder starts with a cam in the crank case which engages a "cam follower" (divided into two parts), or "valve tappet." The upper surface of the "cam follower" holds the end of a hollow push rod—enclosed in a case—and the upper end of the push rod abuts upon one end of a rocker-arm. The rocker-arm is journalled in a housing or box which completely encases it; its other end abuts upon the stem of the poppet valve, depressing it against a spring to dislodge it from its seat in the cylinder head. Thus, by means of this train the cam in the crank case alternately seats and unseats the valve. All this was old in the art.

Oil is pumped by a standard pressure pump through passages in the "cam follower" not necessary to describe, whence it flows through the inside of the hollow push rod, oiling the joint between it and the "cam follower" as it passes. It emerges from the upper end of the push rod and enters a passage in the rocker-arm, oiling the joint between them; thence it passes through the bearing of the rocker-arm and through a passage out of its other end and into the stem of the poppet valve, oiling the joint between these. It is not necessary to describe the further course of the oil during which it cools the valve, because concededly the defendant does not use it. It is enough to say that after passing through certain passages and a chamber in the valve, the oil spills into the rocker-arm box. In the infringement the oil, having lubricated the joint between the end of the rocker-arm and the stem of the valve, similarly spills into the rocker-arm box. Schenk disposes of the oil so spilled by

tapping into each rocker-arm box at its lowest part a pipe which leads to a circular manifold. Since the boxes drain by gravity the manifold has to run below each, and this is accomplished by passing it between the crank case and the boxes in the case of all boxes which are above the level of the crank case, and below the boxes in the case of all that are below that level. The manifold drains into a sump from which a scavenging pump sucks it back to the main oil reservoir.

There was nothing new in the train which leads from the oil pump to the joint between valve stem and the rocker-arm. That had been shown for a "radial" engine in Scott's Patent No. 1,321,338 in 1919, although the oil did not pass beyond the ring of the rocker-arm. Obviously no invention was necessary to pass it to the joint between the rocker-arm and the end of the valve stem. Moreover, if any had been, Simes fully disclosed it for an "in line" engine in Figure 2 of his British Patent No. 223,393 of 1924. However, in these disclosures the rocker-arm and its joints were exposed to the air so that the joints could, and did, gather dirt; but in the Pratt & Whitney "radial" engine the rocker-arm and its joints were housed exactly as in Schenk's disclosure, and indeed he copied this feature from the Pratt & Whitney design. In that engine the bearing of the rocker-arm and its joints with the push rod and the valve stem, were lubricated by a grease gun which had to be used periodically at intervals of from ten to fifteen hours of flight, and which could not be used during flight without difficulty and danger. Schenk's invention, so far as the defendant borrowed from it, can therefore be fairly stated as substituting the automatic oil feed of Scott or Simes in the Pratt & Whitney engine, and making the necessary adjustments to drain back the oil to the reservoir. It is in the drainage of the rocker-arm boxes that the invention, if any, must lie.

There had never been any complete anticipation of Schenk's method of oil disposal in the prior art; the nearest was the Curtiss R–1454 engine about which the evidence has very largely centered. The plaintiff challenges its relevancy, first, because she denies that it is properly a part of the prior art at all; and second, because even though it is, the step between it and Schenk's disclosure required invention. She wishes us to disregard it because it

was only an "abandoned experiment." The district judge thought otherwise, and so do we. Three of these engines were made under a contract with the United States Army and completed in 1925 or 1926 at a cost of over $50,000. They were to be put to a fifty hour endurance test—greater than would be demanded in service—and one of them was. The same one was later installed in a plane, though it does not definitely appear that it was ever used in flight; and in any event it was never exploited, but was taken out and placed in a museum where it was at the time of the trial, accessible to visitors and open for examination. All three of these engines were certainly "experimental"; all three were "abandoned" if by that is meant that the model never went into production and became an historical exhibit. But that is by no means conclusive on the issue of novelty. It is true that the designer, Heron, said that the engine was not successful and that he was surprised that it "worked at all," but he was not speaking of the lubricating system; the defects he referred to were in the crank case, crank shaft and connecting rod; these were the cause of any abandonment, and they were remedied in the Pratt & Whitney engine. In that, however, the lubrication remained what it had been before—manual greasing —automatic oil lubrication being deferred until 1934 when "the customers squawked" for it. It is true that the plaintiff's expert Woeltjen testified that the Curtiss engine would foul the cylinders because the suction was so arranged as not to empty the rocker-arm boxes, and perhaps that was true, though the judge made no finding on the matter. Be that as it may, the testimony does not show that the defect—if it was one—made the engine inoperative.

██ On this showing the engine must be considered a part of the prior art. To be patentable, an invention cannot have been "known or used by others" in this country before the inventor "invented or discovered" it. § 31, Title 35, U.S.C.A. "Knowledge" in this sense is to be distinguished from a public use or sale by the inventor himself for more than a year before he files his application, which is ipso facto an abandonment. Alexander Milburn Co. v. Davis-Bournonville Co., 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651. In computing the year the inventor will be allowed for any time during which he may have publicly used the invention honestly to perfect it, and such a period is frequently spoken of as one of "experiment." Elizabeth v. Pavement Co., 97 U.S. 126, 24 L.Ed. 1000; Egbert v. Lippmann, 104 U.S. 333, 26 L.Ed. 755; Thomson-Houston Electric Co. v. Lorain Steel Co., 2 Cir., 117 F. 249. It is also true that another's experiment, imperfect and never perfected, will not serve either as an anticipation or as part of the prior art, for it has not served to enrich it. The patented invention does not become "known" by such a use or sale, or by anything of which the art cannot take hold and make use as it stands. But the mere fact that an earlier "machine" or "manufacture," sold or used, was an experiment does not prevent its becoming an anticipation or a part of the prior art, provided it was perfected and thereafter became publicly known. Whether it does become so depends upon how far it becomes a part of the stock of knowledge of the art in question. Coffin v. Ogden, 18 Wall. 120, 21 L.Ed. 821; Brush v. Condit, 132 U.S. 39, 44–48, 10 S.Ct. 1, 33 L.Ed. 251; Parker v. Ferguson, Fed. Cas.No.10,733, 1 Blatchf. 407; Stitt v. Eastern Railway Co., C.C., 22 F. 649. Our own decision in Universal Winding Co. v. Willimantic Linen Co., 2 Cir., 92 F. 391, accepting in this respect Judge Townsend's opinion, C.C., 82 F. 228, 239, 240, is an illustration extremely apt to the case at bar. Judged by that standard, the Curtiss engine was not an "abandoned experiment"; it had been perfected; it had withstood a severer test than was necessary in use; it had been sold; it remained permanently accessible to the art, a contribution to the sum of knowledge so far as it went.

It is another question how far it did go. Even though we take the final form which was made before the fifty hour test was completed, the rocker-arm boxes were not drained by gravity, though gravity contributed to draining those which were inclined above the horizontal. The disclosure differed from Schenk's in that the drainage was by suction direct from the manifold, which for that reason did not drain into a sump. Woolson's second patent (No. 1,836,637) which was applied for about two and a half years before Schenk filed his application (October 17, 1929) filled the hiatus; it was for a lubrication system in a V engine in which the cylinders were inverted and the boxes which enclosed the valve actuating means drained at their lowest point into pipes which led to

a scavenging pump. The following passage so discloses (page 2, lines 38-41): "oil from the valve housings, 26, is also removed through separate conduits, 36, and delivered to the reservoir by a pump, 37." Woolsen's engine had apparently been made and used two years before his filing date, and, as the art stood when Schenk filed his original application, oil from the rocker-arm boxes of a "radial" engine had been drained by suction from pipes leading to a manifold, and by gravity from the inverted cylinders of a V engine.

■■ It is always troublesome to know what improvements—for Schenk's disclosure was undubitably an improvement—deserve to be called inventions; as we have often said, the safest test is to try to reconstruct the history of the art before and after their appearance and judge from that how far they demanded exceptional talents. Unhappily, that seldom really helps much to an answer because we cannot isolate the contributing factors. The plaintiff argues that the art was not content with the laborious method of repeatedly greasing the rocker-arm boxes at short intervals; that Heron, an exceptionally qualified engineer, if he did not fail (and we have seen that he did not), at least did not hit upon the method which finally prevailed; and that the need of automatic lubrication had existed for ten or more years before Schenk. This convinced the judge, and we too feel its force; but it does not seem to us to take into account the whole situation. Schenk must be judged as though he had knowledge of Woolson's disclosure as well as of the Curtiss engine; and both were only four years old when he filed; the art had not had long to wait for the change, and the only evidence is that much of greater importance was occupying designers. The Curtiss engine being weak in other and more serious parts than its lubricating system, the Pratt & Whitney engine supplanted it; but that engine was itself still in course of development and was not stabilized until 1933. Wilgoos, its designer, testified that until 1934 he and his associates "were engaged in work so much more important to the development of our engines which required the entire faculties of our engineering and development group that the pressure lubrication was left as a later item." We can well believe that, as Heron said, it destroys the organization of a factory to keep introducing a multitude of innovations, and that the orderly development of a machine so complicated, so dangerous and so fragile, may have to proceed step by step. We cannot say in the face of this that it took uncommon ingenuity merely to conceive of draining the rocker-arm boxes by gravity. That had already been in part done in the Curtiss engine in the upper boxes; it was common practice in "in line" engines and V engines; and we have Schenk's own word for it that the difficulties which his invention met were common to both the "radial" and vertical engines. Nor can we say that, once conceived, the design was difficult. Woolson had disclosed it for the lower boxes; what remained to be done was to carry the manifold so that it should be below each box to be drained. A "dry sump" was already common in such engines. Unless we are to mistake for invention the slow but inevitable progress of an industry through trial and error, and confer a monopoly merely upon the exercise of persistent and intelligent search for improvement, there was no invention in this. Nor will we weigh heavily the hortatory commendation in the defendant's advertisements—even when vouched for by experts —or its devious efforts to procure the invention from Schenk. Even if the last was discreditable, there is more at stake than the issues between the two parties; and the industry must not be bitted because one infringer's conduct has not been commendable. We cannot, moreover, ignore the fact that the Supreme Court, whose word is final, has for a decade or more shown an increasing disposition to raise the standard of originality necessary for a patent. In this we recognize "a pronounced new doctrinal trend" which it is our "duty, cautiously to be sure, to follow not to resist." Perkins v. Endicott Johnson Corp., 2 Cir., 128 F.2d 208. We hold that the claims in suit are invalid for lack of invention.

The plaintiff also asserts that her complaint alleged a second cause of action based upon Schenk's disclosure "in confidence" to the defendant's vice-president, Tillinghast, of certain details of his engine not shown in his specifications. The defendant took Schenk's deposition before trial, the important part of which for this purpose was the following: "I asked him whether it would be all right, that I was taking him into my confidence because I did not have any patents on that part of it, and I was disclosing something that was not covered by any patents, or anything else,

and he assured me that anything that I would mention or talk to him about automatic lubrication would be perfectly in confidence and he would not permit it to become public in any way. He said a company of their reputation would not in any way consider doing anything that was not right toward an inventor." The allegations of the complaint were indeed vague, but under modern practice they were enough, we think, to support a cause of action for violating an implied agreement not to make use of any disclosure not "covered by any patents." At the trial the defendant read in evidence parts of Schenk's deposition and the plaintiff offered the rest of it, including the part just quoted. To this the defendant objected on the ground that the complaint had not alleged the cause of action to which alone that part was relevant. The judge sustained this objection provisionally, but declared that he would take the point under advisement and make a final ruling later. Nothing more was done until he filed his opinion and findings when he admitted the whole deposition, but ruled that such an agreement as Schenk had sworn to, would not survive issuance of the patent, because the breach, if any, had occurred after the patent issued. The plaintiff answers that since the details on which she relies were not in the specifications, Schenk did not dedicate them to the public; they were improvements and the defendant might promise not to make use of them and should be held to its promise after issue as well as before.

As a general principle a patentee dedicates or surrenders all that he discloses except so far as the claims reserve it. Mahn v. Harwood, 112 U.S. 354, 361, 5 S.Ct. 174, 6 S.Ct. 451; 28 L.Ed. 665; McClain v. Ortmayer, 141 U.S. 419, 424, 12 S.Ct. 76, 35 L.Ed. 800; Ball & Roller Bearing Co. v. Sanford Mfg. Co., 2 Cir., 297 F. 163, 168. The question has several times arisen whether if he has imparted the disclosure to another under an implied promise not to use it—i.e. "in confidence"—he may hold the promisor after the patent issues. Clearly he should be allowed to hold him for any breach during the period between the imparting of the secret and the issue of the patent. Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912, 923. And the Sixth and Seventh Circuits have held that he may also hold him for a breach after issue on the notion that although issue puts the disclosure in the public demesne whether the patent be valid or not, the promisor has surrendered his privilege as a member of the public. Smith Corp. v. Petroleum Iron Works Co., 6 Cir., 74 F.2d 934; Shellmar Products Co. v. Allen-Qualley Co., 7 Cir., 87 F.2d 104, 107, 108. (In Booth v. Stutz Motor Car Co., 7 Cir., 56 F.2d 962, it does not appear that the disclosure of the invalid patent included the pirated design.) No doubt the parties may agree if they wish that the promisor shall not use the disclosure, should the pending patent issue but turn out to be invalid. Indeed, they might even agree that he shall not use it even if the patent proves valid; e.g. the patentee might wish more than seventeen years' protection. But the expression of such an intent should be explicit, for in most cases the applicant will not need protection unless the patent does not issue, or if it does, only while its issue is undetermined. The promisor should not be held to an interpretation extending the agreement to the possibility that the patent may prove invalid, because the applicant is proposing to broadcast the invention to the world at large, reserving as his protection only the claims which he may secure; and there is ordinarily no reason to suppose that he means to exact any greater protection against the promisor than he will have against others. At any rate, if he does, he should say so. Hence if the agreement in the case at bar had been merely a general promise not to use the disclosure, the judge would certainly have been right.

Schenk says that it concerned two matters not disclosed, variants of the specifications; a "valve tappet" ("cam follower") in one piece, not two; and a manifold—not strictly a manifold at all —consisting of a series of pipes connecting each rocker-arm box to its neighbor, with a sump placed between the two lowest boxes. If these variants had not been species of the genus covered by the claims there would be good reason for saying that the promise was not to end with issue. But they were only species and the claims did cover them, and Schenk did not need the promise except in the interim before issue, or in case he got no patent at all. Besides, we are not left to conjecture as to his intent for he expressly said that the "confidence" which he exacted was for matters "not covered by any patents"; apparently he supposed that the variants were not covered. Be that as it

may, Tillinghast could only have understood him as asking that the disclosure should be protected after issue only so far as the claims would not protect it, for it would have been absurd for him to assume that Schenk was asking for more protection as to these relatively trifling details than he was to get for the very kernel of his invention. The natural meaning to impute to the transaction was that until issue no part of the disclosure was to be used, and after issue no part which was "not covered by any patents."

Decree modified to hold invalid claims 4 and 14, and otherwise affirmed; complaint dismissed.

FRANK, Circuit Judge (concurring).

The man on the street (or in the subway) would, I think, believe, as did the trial judge, that Schenk's patent embodies an invention. Originally, I was strongly inclined to join in that view. For no one can doubt that Schenk substantially advanced the art. Defendant certainly thought so: Not only did it try by stealth to buy Schenk's patent, but, after it began to use his device, it advertised it, with fulsome praise, as a great step forward. And others, before Schenk, had unsuccessfully sought to achieve the same result. His device, once disclosed, seems obvious and simple. But that is the nature of most important creative ideas. Once we know of them, it seems as if we must always have done so. Science endeavors to move in the direction of simplicity. (Ptolemy had his Newton; and Newton, his Einstein. We increase knowledge importantly, so to speak, by shaving old ideas with Occam's razor.) "After a new invention is completed, it is then very easy to see how it was accomplished. But such enlightenment, resembling apparent simplicity, is the product of hindsight." Scott & Williams, Inc. v. Whisnant, 4 Cir., 126 F.2d 19, 22. Schenk's device involves no new scientific principle. However, it is not the discovery but the application of scientific principles which constitutes patentable invention. Old elements are employed; but the cases are legion that that fact alone does not preclude invention.[1] And Schenk's device seems to me to em-

---

[1] Certainly, in literature, creative genius often consists of the imaginative assemblage of old materials.

Lowes, in The Road to Xanadu (2d ed. 1930), does a remarkable job of tracing, through Coleridge's notebooks, the books the poet had read not long before he wrote these lines:

"Beyond the shadow of the ship,
I watched the water-snakes:
They moved in tracks of shining white,
And when they reared, the elfish light
Fell off in hoary flakes.

"Within the shadow of the ship
I watched their rich attire:
Blue, glossy green, and velvet black,
They coiled and swam; and every track
Was a flash of golden fire."

Coleridge, Lowes shows, had found in his readings passages referring to water-snakes which arched into "coils" and of "divers colours"; of "snakes, green, yellow, black, white and some partie-coloured"; of how fish, when swimming, left "a luminous track," or "kind of artificial Fire in the Water," and how in the wake of a ship there were "vortices * * * like Flashes of Lightning"; of sea-animals "swimming about" in a sea "covered with a kind of slime," and that some of them "had a white or shining appearance," emitting "the brightest colors of the most precious gems," including a "green tinged with a burnished gloss," various "tints of blue" and "opaline red-

ness," the color having "the appearance of glowing fire"; and that he had read a poem about dolphins and porpoises.

Lowes says (53, 434): "Those, then, at last, are the raw materials. The result is all of them and none of them—it is a new creation. The fishes which Father Bourzes saw in tropical seas and Bartram in a little lake in Florida, and the luminous blue and green protozoa which Captain Cook observed in the Pacific, and the many-hued, ribbon-like creatures that Sir Richard Hawkins marvelled at off the Azores, and Dampier's water-snakes in the South Seas, and Leemius's coiling, rearing marine serpents of the North, and Falconer's gamboling porpoises and dolphins—all of them or some of them—have leaped together like scattered dust at the trumpet of the resurrection, and been fused by a flash of imaginative vision into the elfin creatures of a hoary deep that never was and that will always be. The shaping spirit of imagination must have materials on which to work, and a memory steeped in travel lore was this time the reservoir on which it drew. * * * Yet the pieces that compose the pattern are not new. In the world of the shaping spirit, save for its patterns, there is nothing new that was not old. For the work of the creators is the mastery and transmutation and reordering into shapes of beauty of the given universe within us and without us. The shapes thus wrought are not that uni-

body far more ingenuity than did that of Mead which was held not to support a patent in Cuno Corp v. Automatic Devices Corp., 314 U.S. 85, 62 S.Ct. 37, 86 L.Ed.

Notwithstanding such reflections, because my colleagues are far better versed than I in passing on patents, I am reluctantly constrained to join in their decision, since it represents their experienced interpretation of that "doctrinal trend" to which Judge Hand refers and which, at least since 1928, has spelled itself out in Supreme Court decisions sustaining a very small percentage of patents.[2]

"Invention," for patent purposes, has been difficult to define. Efforts to cage the concept in words have proved almost as unsuccessful as attempts verbally to imprison the concept "beautiful." Indeed, when one reads most discussions of "invention," one recalls Kipling's, "It's pretty, but is it Art?" and the aphorism that there is no sense in disputes about matters of taste. Anatole France once said that literary criticism is the adventure of the critic's soul among masterpieces. To the casual observer, judicial patent decisions are the adventures of judges' souls among inventions. For a decision as to whether or not a thing is an invention is a "value" judgment. So are many other judicial judgments in other legal provinces, but "invention" is a peculiarly elusive standard. To be sure, there are those who assert that we can arrive at objective art standards through noting the intuitive judgment of experts in the fine arts; others (and I am one) are somewhat sceptical. Yet it may well be that a high degree of objectivity can be attained in some such way in the field of invention.

And that is what, as I understand it,

Judge Hand, in effect, suggests in his opinion here. He applies a negative test: Nothing is an invention which is the product of "the slow but inevitable progress * * * through trial and error" and of "the exercise of persistent and intelligent search for improvement." Obviously, for the intelligent application of such a test, there is needed the judgment of men who are experts in science, since the ordinary man has no means of knowing how any new process or machine was discovered.

When one grasps that fact, he perceives the startling implications of Judge Hand's negative test of invention. I bow to his superior wisdom and accept that test. But I think it desirable to point out where we are heading, by recognizing those implications. At the same time, I shall suggest briefly how the less desirable of them might perhaps be avoided through changes in the statute. Here I have in mind the example set by Judge Hand in 1911 in Parke-Davis & Co. v. H. K. Mulford Co., C.C., 189 F. 95, 115, where he deemed it appropriate that the judiciary should call public attention to defects in our patent system, in the hope that the disclosure of those defects would lead to statutory amendments.[3]

In the first place, it is clear that very few men on the bench can qualify as scientific experts—as Judge Hand provocatively suggested in Parke-Davis & Co. v. H. K. Mulford Co., supra, 189 F. at page 115: "I cannot stop without calling attention to the extraordinary condition of the law which makes it possible for a man without any knowledge of even the rudiments of chemistry to pass upon such questions as these. The inordinate expense of time is the least of the resulting evils, for only a trained chemist is really capable of

---

verse; they are 'carved with figures strange and sweet, All made out of the carver's brain.' Yet in that brain the elements and shattered fragments of the figures already lie, and what the carver-creator sees, implicit in the fragments, is the unique and lovely Form."

[2] That trend is not (as some commentators imply) due to the presence on the Supreme Court of Justices appointed by President Franklin D. Roosevelt. No such appointee sat in that court before May 24, 1937. Yet, in the ten-year period ending with that date, the Supreme Court, as I compute it, held 17 patents invalid and 2 valid. One patent twice held valid in 1935 was denied validity by the same Justices in 1937. In Bassick Mfg. Co. v. R. M. Hollingshead Co.,

1936, 298 U.S. 415, 56 S.Ct. 787, 80 L. Ed. 1251, the patentee had won 299 victories in the lower courts, but the Supreme Court held the patent invalid except as to narrow claims which were not infringed; perhaps, in a limited sense, that was a decision for validity; on that basis, the score for that decade is 16 (invalid) to 3 (valid).

[3] Cf. Cardozo, A Ministry of Justice, 35 Harv.L.Rev. 113 (1921). See Judge Hough's criticism of the non-statutory rules relating to arbitration in United States Asphalt Refining Co. v. Trinidad Petroleum Co., D.C.1915, 222 F. 1066, which contributed to the enactment of the United States Arbitration Act, 9 U.S.C.A. § 1 et seq.

passing upon such facts, e.g., in this case the chemical character of Von Furth's so-called 'zinc compound,' or the presence of inactive organic substances. * * * How long we shall continue to blunder along without the aid of unpartisan and authoritative scientific assistance in the administration of justice, no one knows; but all fair persons not conventionalized by provincial legal habits of mind ought, I should think, unite to effect some such advance." Little has happened in the intervening thirty years since that case was decided to justify a different view today. If, then, we are to utilize the test of invention set forth in the foregoing opinion, we judges should adopt the suggestion made in the Parke-Davis case, and should consult with thoroughly disinterested scientists.

And here we come to the startling implications of Judge Hand's yardstick for invention. For suppose that the judges in patent cases rely on thoroughly disinterested experts who are fully aware of what is going on in the scientific world. I suspect that those experts will report that today only a very small fraction of mechanical or chemical novelties are anything more than what has been yielded "through trial and error" and the "exercise of persistent and intelligent search for improvement." In other words, it is highly likely that only an infinitesimal percentage of so-called inventions will be patentable under Judge Hand's test, if informedly applied. My reason for so surmising are as follows:

Before the modern large-scale research laboratories and modern scientific techniques were developed, it was correct to say that the "discoveries" of men like Edison resulted from creative genius. The area open for discoveries thus made has become severely restricted. For that we have the word of experts: In 1935, a Committee of the Science Advisory Board, consisting of men who have played conspicuous roles in the progress of science and the useful arts,[4] published a Report on The Relation of the Patent System to the Stimulation of New Industries. The

Committee's Report reads in part as follows: "There has been enormous change in technique and commercial practice in the last hundred years. The patent system at its inception contemplated an individual inventor, given a monopoly for 17 years as a reward and stimulant for invention, and to enable funds to be obtained from commercialization. This simple situation no longer obtains. What was originally a self-sufficient patent to an individual for 17 years has developed into a patent structure or assemblage of patents, giving a substantially permanent monopoly in an advancing art to an industry or a group of industries. The justification for the extension in a democratic country of an absolute monopoly to an invention, in lieu of maintaining it secret, no longer applies generally. In these days of intensified research and development, it is the usual experience to find that important advances arise nearly simultaneously at many points. They are the result of an advancing knowledge and technique, and the advent of a specific human need and commercial opportunity. The individual inventor plays an important part in recognizing the situation and supplying the needed combination. In most cases, however, he could not hold it secret and use it privately if he wished. Moreover, if he did not appear with his invention, it would not be long in these intense times before some other inventor would supply the necessary creative thought. This is not exclusively the situation of course. There are still brilliant and striking flashes of intellect which create startling inventions which would not otherwise be made for perhaps a generation. The point is that inventions of this type are few and far between, and they are insignificant in number compared to the nearly 100,000 patents now issued annually. Moreover, most of these brilliant advances would be made and disclosed whether or not there was a patent system to produce a reward. The old justification for the extension of exclusive monopoly no longer holds." As Kaempffert says:[5] "It is not difficult to predict the

[4] The Committee consisted of F. B. Jewett (Vice-President of American Telephone & Telegraph Company and President of Bell Telephone Laboratories), Vannevar Bush (Chairman, Vice President and Dean of Engineering, Massachusetts Institute of Technology), W. H. Carrier (Chairman of the Board, Carrier Engineering Corporation), D. M. Compton (industrial consultant) and H. A. Poillon (President of Research Corporation).

The Report may be found in T. N. E. C. Hearings (January 16-20, 1939) p. 1139.

[5] Kaempffert, Invention and Society (1930) p. 30; see also pp. 28, 29.

effect of industrial group research on invention. As organized invention and discovery gain momentum, the revolutionist [type of inventor] will have no chance in an explored field. Possibly Edison may be the last of the great heroes of invention."

There has been, it thus appears, a basic change in the springs of mechanical and chemical progress. And the method by which "discoveries" are now, usually, made in group laboratories are precisely those which, according to Judge Hand's test, do not yield inventions. His interpretation of the Supreme Court decisions serves to explain that Court's so-called "new attitude" towards patents. For the wording of the standard currently applied by it is not novel: When, in 1941, the Court said that invention involves a "flash of creative genius," [6] it was merely repeating, in slightly altered words, what it had said some sixty years earlier, in 1880, when it spoke of a "flash of thought" as a vital ingredient of invention.[7] Accordingly, it may be said that there is a correlation between Supreme Court patent decisions and the fundamental sources of technological advances; that, at bottom, it is not the Court's attitude that has been modified, but the nature of scientific study.

If all that be true, then, perhaps, with exceedingly few exceptions, it will only be to the untrained eye of a member of the judiciary (i. e., to a scientific amateur) that anything will appear to be an invention. If Judge Hand's yardstick is applied, a valid patent will, usually, be a function of judicial scientific ignorance. But, as Judge Hand points out in his opinion in the case at bar, in a patent suit "there is more at stake than the issues between the two parties"—i. e., the public interest needs protection.[8] As Lewis Carroll's Duchess would say, "the moral of that is" that it is intolerable that the public interest should be at the mercy of the haphazard scientific information of judges. Accordingly, to repeat, we judges ought to have as our advisers a staff of disinterested scientists (just as, in corporation reorganizations, under the Chandler Act, Chapter X, 11 U.S.C.A. § 501 et seq., the district judges are now advised by specialists furnished by the S. E. C.).[9] And, in each patent suit, the patentee ought to be required to disclose precisely how he arrived at his new device, in order that the court, advised by its own experts, can tell whether it was merely the result of "trial and error" and "the exercise of persistent and intelligent search for improvement," in which event, according to Judge Hand's formula, the patent would not be valid.

If Judge Hand's negative criterion is sound, it should be applied to all patents. But, as matters now stand, it will not be. The Patent Office grants from 50,000 to 100,000 patents each year. The Committee of the Science Advisory Board reported that it was one of the primary defects in our patent system that the Patent Office issues "an enormous number of patents, many of which should never be issued * * *" That probably means, as the Committee intimated, that the standard of inventiveness employed by the Patent Office is far below that employed by the courts. Yet most patents escape judicial scrutiny, since few patents ever get into court. For the expense of defending a patent suit is often staggering to the small businessman. And there is reason to believe that, unable, for that reason, to defend a threatened patent suit, many persons capitulate to a well financed patentee without litigating; the result is that many patents, which are "spurious"—i. e., would probably not stand up in court, if contested—confer, in actual fact, patent monopolies which are as effective, for all practical purposes, as if they had been judi-

[6] Cuno Corp. v. Automatic Devices Corp., 314 U.S. 84, 91, 62 S.Ct. 37, 41, 86 L.Ed. —.

[7] Densmore v. Scofield, 102 U.S. 375, 378, 26 L.Ed. 214.

[8] Morton Salt Co. v. G. P. Suppiger Co., 1942, 314 U.S. 488, 482–494, 62 S.Ct. 402, 86 L.Ed. —; United States v. Univis Lens Co., May 11, 1942, 62 S. Ct. 1088, 86 L.Ed. —; United States v. Masonite Corp., May 11, 1942, 62 S. Ct. 1070, 86 L.Ed. —; Densmore v. Scofield, 1880, 102 U.S. 375, 378, 26 L.Ed. 214; Kendall v. Winsor, 1858, 62 U.S. 322, 328, 329, 21 How. 322, 16 L.Ed. 165; The Clean Hands Defense in Patent Infringement Suits: An Expanded Concept, 51 Yale L.J. 1012 (1942); Note, 9 Un. of Chi.L.Rev. 518 (1942).

[9] The advice given by the S. E. C. in reorganization cases can be disregarded by the judge. I take it that Judge Hand, in the Parke-Davis case, was not suggesting that a judge in a patent suit should be bound by any expert advice.

On the general subject of expert advice in judicial proceedings see Beuscher, The Use of Experts by the Courts, 54 Harv. L.Rev. 1105 (1941); L. Hand, Historical and Practical Considerations regarding Expert Testimony, 15 Harv.L.Rev. 40 (1901)

cially held valid. The actual enjoyment of a patent monopoly—which, of course, has its effect on the public—may, it seems, often depend on the fact that the patent is owned by a wealthy concern and that alleged infringers lack funds to defend themselves. But the exploitation of such a monopoly should not turn on such fortuitous circumstances. Judicial determination of validity should not be limited to those patents which happen to be the subject of patent litigation privately instituted. "It is * * * important to the public that competition should not be repressed by worthless patents * * *" Pope Mfg. Co. v. Gormully, 1892, 144 U.S. 224, 234, 12 S.Ct. 632, 636, 36 L.Ed. 414.[10] "Because of the expense, * * * a judicial review of patents by private litigation alone is inadequate as a check on the threat of invalid patents arising from the superficial search of the patent office and the one-sided appellate review from its decision," says a recent thoughtful commentator.[11] The public interest would, then, seem to require that some representative of the public be authorized to provoke a suit to test the validity of any patent.[12] Incidentally, suits thus brought, and the staffing of the courts with their own experts in all patent suits, might do much to reduce the cost of patent litigation, both for patentees and alleged infringers.

Maybe, then, this is where we are heading: Maybe, if we adhere to a patent system founded on the notion of giving rewards to inventors, and, if at the same time, we streamline that system, we shall discover that there will be but the tiniest handful of persons entitled to such rewards.

As Judge Hand recently remarked in another case, "Perhaps the [patent] system is outworn. * * *" Dewey & Almy Chemical Co. v. Mimex Co., 2 Cir., 1941, 124 F.2d 986, 990.[13]

If that means that every kind of patent system is outworn, the idea is disturbing. For, as I see it, there seems still to be room for some kind of patent monopoly which, through hope of rewards to be gained through such a monopoly, will induce venturesome investors to risk large sums needed to bring to the commercially useful stage those new ideas which require immense expenditures for that purpose.

We may not need patents as rewards to inventors. Modern industrialism owes much to the ideas of Faraday, who cared nothing for money. Kaempffert writes: "To be sure, inventors long for wealth. So do poets. But the patent laws are no more responsible for great inventions than are copyright laws for great poems. Watt was no more impelled by the desire to make money when he invented the separate condenser than Milton was impelled to earn the equivalent of twenty-five dollars by writing Paradise Lost."[14] Many universities and other endowed institutions have today large laboratories in which group research is conducted; licenses, under patents taken out on many inventions thus produced, are, often, freely granted on the basis of small royalties, the patents being utilized primarily to stop socially undesirable uses of the inventions.[15]

But if we never needed, or do not now need, patents as bait for inventors, we may still need them, in some instances, as a lure to investors.[16] It is sometimes said that

---

[10] But cf. United States v. American Bell Telephone Co., 1897, 167 U.S. 224, 17 S.Ct. 809, 42 L.Ed. 144. See, however, United States v. Standard Oil Co., D.C.1929, 33 F.2d 617, 623, reversed on other grounds, 1931, 283 U.S. 163, 51 S.Ct. 421, 75 L.Ed. 926.

[11] Woodward, A Reconsideration of the Patent System as a Problem of Administrative Law, 55 Harv.L.Rev. 950, 945–957 (1942).

[12] Cf. Hamilton, Patents and Free Enterprise (T. N. E. C. Monograph No. 31) 151–152.

It should be noted that that monograph was recently cited with approval by the Supreme Court in Cuno Corp. v. Automatic Devices Corp., 1941, 314 U.S. 84, at page 92, 62 S.Ct. 37, 86 L.Ed. ——.

[13] That considerable revision is in order is indicated by the fact that no sub-

stantial changes have been made in our patent law since 1836, during a century in which modern industrialism has developed. Each of the other major industrial countries has overhauled its patent laws within the past ten years.

[14] Loc. cit. 19; cf. 23, 24, 33. See also Paul Douglas, The Reality of Non-Commercial Incentives in Economics, in The Trend of Economics (1924) 153; cf. Taussig, Inventors and Money Makers (1930).

[15] See testimony of Vannevar Bush (formerly Dean of Engineering at the Massachusetts Institute of Technology, and now President of the Carnegie Institute), T. N. E. C. Hearings (January 1, 1939) pp. 876ff.

[16] Occasionally the inventor is also an investor in his own devices.

there is no need thus to coax investors, because our giant corporations, with their research laboratories, will, without such bait, do the needful. The answer perhaps is that industrial history discloses that those corporations, at times and to some extent, have been prodded [17] into undertaking such research and into developing improvements because of the threat of competition from occasional "outsiders," [18] armed with patent monopolies, and supplied with funds by a few private enterprisers. Thus, paradoxically, monopoly may evoke competition: The threat from patent monopolies in the hands of such "outsiders" may create a sort of competition—a David versus Goliath competition—which reduces the inertia of some huge industrial aggregations that might otherwise be sluggish.

I happen to know of one inventor who, together with his friends, spent many thousands of dollars and many years of effort in bringing to the stage of practical utility a patent that markedly advanced the art in an industry the major established components of which were uninterested in new processes. Without those large financial outlays—which would not have been made but for the hope of acquiring a valid patent monopoly—the public, in all likelihood, would have been deprived of very real and substantial benefits. It would seem to be both unfair and unwise to apply so severe a test of invention as to render such a patent invalid.

To denounce patents merely because they create monopolies is to indulge in superficial thinking. We may still want our society to be fundamentally competitive. But there has seldom been a society in which there have not been some monopolies, i. e., special privileges. The legal and medical professions have their respective guild monopolies. The owner of real estate, strategically located, has a monopoly; so has the owner of a valuable mine; and so have railroad and electric power companies. The problem is not whether there should be monopolies, but, rather, what monopolies there should be, and whether and how much they should be regulated.[19]

And so patent monopolies may still be socially useful; they may, indeed, as I have said, foster competition. The David Co. v. Goliath, Inc. kind of competition is dependent on investment in David Co.—the small new competitor. And few men will invest in such a competitor unless they think it has a potential patent monopoly as a slingshot. Accordingly, the suggestion—recently endorsed in an editorial in so conservative a newspaper as the New York Times [20] —that all patentees be required to grant licenses to others on reasonable terms might, unless qualified, seriously retard industrial progress: A provision for universal compulsory licenses may do no harm—perhaps it will do much good—to inventors, but may tend to frighten off extensive investment in new patents which will induce competition with the giant industrials.[21]

The controversy between the defenders and assailants of our patent system may be about a false issue—the stimulus to invention. The real issue may be the stimulus to investment. On that assumption a statutory revision of our patent system should not be too drastic. We should not throw out the baby with the bathwater. A more moderate revision along the following lines may be sketchily indicated. There might be a classification of patentable devices into two categories:

(a) The first category would consist of "gadget" patents and those for contrivances which require for their development relatively small expenditures; as to them, there might be a very brief period of patent monopoly.

(b) The second category would consist of those which require the investment of relatively large sums to bring them to practicable fruition.[22]

---

[17] Cf. National Resources Committee, Technological Trends and National Policy (1937) 39–66.

[18] By "outsiders" I mean persons outside the giant corporations.

[19] There is scarcely ever such a thing as a "perfect" monopoly, just as there is scarcely ever "perfect" competition. There are divers minglings of monopoly and competition.

[20] New York Times, May 15, 1942, p. 18.

[21] For that same reason, it would be a doubtful expedient to assimilate patents to copyrights so that infringement would consist of knowingly copying the device disclosed in a patent.

[22] Cf. Woodward, loc. cit., at 967–969, 977.

Someone might ask whether a statute, under which patents would be granted not to inventors but to investors, can be founded on the patent clause of our Constitution. If not, perhaps it could, like the trademark statute, be based on the interstate commerce clause.

As to this second type of patents, we might well adopt and adapt the provisions of the so-called Lloyd George Act, enacted in England in 1906 and since then improved by amendments: At the end of three years, a patentee must show at a public hearing [23] either (1) that the patented device is being commercially sold in sufficiently large quantities to meet public demand at reasonable prices which (the risk considered) yield an adequate return on the investment, or (2) that, despite large expenditures and bona fide diligent efforts, the device is not yet in a commercially adequate stage, or (3) that there is some other proper basis for delay not injurious to the public interest. If no such showing were made, then either the patent would be cancelled or the patentee would be required to issue licenses on reasonable terms. [24] Such provisions would prevent what the English call an abuse of the monopoly. They would make impossible the practice of procuring patents never to be used but acquired solely to "fence in" competitors [25] by blocking their right to sell improvements on competitive devices. No one knows how widespread that practice is; that it exists to some extent is undenied; the Paper Bag Patent case, Continental Paper Bag Co. v Eastern Paper Bag Co., 1908, 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122, apparently sanctioned it; [26] but many persons have urged that the statute be amended to make the practice unlawful. And something in the nature of the English statute [27] would also serve to prevent the possible use of international patent cartels with the alleged undesirable consequences currently ascribed to them by Assistant Attorney General Arnold. (I make no comment as to the

[23] Any such hearing should be publicly held.

The percentage of determinations of the Patent Office which are upset in the courts is far higher than that of any other federal administrative agency. That may be due to the fact that, unlike those of any other agency, the proceedings of the Patent Office are not open to the public.

The S. E. C., for instance, grants (never denies) permits without hearings in certain cases under the Public Utility Holding Company Act; but it does so only after publishing a notice advising that a public hearing will be held if asked by a person properly interested.

[24] For a summary of the provisions of the English statute, see Halsbury, Laws of England (2d ed. 1937) 731ff. It applies to all patents.

The English statute as to non-user resembles the South Carolina statute of 1784. See Hamilton, loc. cit., 22–24; Meyers and Lewis, The Patent "Franchise" and The Antitrust Laws, 30 Georgetown L.Rev. (1941) 117, 123.

It has been intimated that any compulsory license statute would be unconstitutional. To avoid such an objection, it could be provided that the patent be initially issued for a period of three years, to be renewed periodically (with a maximum life of 17 years) upon a showing by the patentee of the facts indicated in the text.

[25] In 1930, an official of a powerful patent-owning company wrote a memo for its files (not intended for publication) saying in part: "In taking out patents, one of our main purposes is to secure patents on possible improvements of competing machines so as. to 'fence in' those and prevent them reaching an improved stage. * * * We now have a number of applications which were filed to definitely forestall the development of competing machines by others." The memo also referred to a corporate policy of "indirect patent protection" which "seems to block competing devices which would lessen our income." T. N. E. C. Hearings, 771, 776, 777, 778. The company, however, asserted that this memo did not accurately reflect its policy.

[26] The last sentence of the opinion suggests that there might be exceptions to the rule of that case.

The rule of the Paper Bag case became the foundation for the decision in the Dick case [Henry v. A. B. Dick Co., 1912, 224 U.S. 1, 32 S.Ct. 364, 56 L.Ed. 645, Ann.Cas.1913D, 880] sustaining tying clauses. The Dick case has since been completely repudiated in Carbice Corp. v. American Patents Corp., 1931, 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819; and the use of a tying clause now precludes relief against an infringer. Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. —. Yet the basic rule of the Paper Bag case still stands unreversed.

[27] When it was argued before the T. N. E. C. that few suits had been brought under that statute to procure compulsory licenses. Congressman Hatton Sumners intimated that perhaps the mere existence of such an Act made such suits unnecessary. T. N. E. C. Hearings (Dec. 5, 1938) p. 278. The Canadian Patent Commissioner recently told me that the similar provision of the Canadian statute has had just that effect.

controversial question whether, in fact, there have been such consequences.)

It would, further, prevent a giant corporation, dominant in a given field, from buying up a patent issued to an "outsider" for the purpose of putting it in mothballs, in order to block the use of an improvement on its own products which that corporation might consider undesirable because it would compel the scrapping of some of its existing plants or equipment. How widespread that practice has been, again no one knows; but that it has sometimes occurred is undeniable.

Some persons, to be sure, argue that the too rapid obsolescence of plant and equipment through new developments is socially undesirable.[28] That is debatable ground, perhaps, although such retardation of our nation's technology now seems of doubtful value since it weakens preparedness for war with another country which has not similarly, in pre-war days, retarded its technology. Pearl Harbor has shocked us into many new orientations. And, in particular, it has aroused new thinking about patents. Just a few weeks ago, on April 17, 1942, the President wrote to the Chairman of the Senate Committee on Patents: "The problem you are studying is vital. Patents are the key to our technology; technology is the key to production; production is the key to victory. I trust that your Committee will * * * help the government to formulate a wise patent policy to guide us through that victory for democracy which we all so devoutly wish."

It is surely questionable, then, whether the control of our industrial development, so far as it is exercised through patents, should be left solely to patentees; as the public interest is deeply involved, it would seem wise that representatives of the public should at least participate in decisions of any such matters. For patents are governmentally created monopolies. The Supreme Court has called them "public franchises," [29] granted by the government, acting on behalf of the public. It is, accordingly, appropriate to ask whether the holder of such a public franchise should be permitted, without any governmental control whatever, to decide that no public use should be made of the franchise during its life or only such public use as the franchise-holder, in its utterly unregulated discretion, deems wise, and at such prices as it sees fit to exact. We accord no such powers to the holder of a public franchise to run a bus line or to sell electric power.

To bring patents into line with the constitutional provision relating to patents, it is worth considering whether they should not, by statute, be assimilated, to some extent, to certificates of convenience and necessity. For one may doubt whether the birth-control or arbitrary restrictions on the manufacture of new important industrial devices by private persons owning patents could have been in the minds of the Founding Fathers when they provided in the Constitution that Congress might pass laws authorizing patents to "promote the Progress of Science and Useful Arts." A patent system which thus stressed the public obligations of patentees while, at the same time, it furnished protection to investors in patents, would be well worth achieving.

[28] Cf. Brandeis, J., dissenting, in New State Ice Co. v. Liebmann, 285 U.S. 262, 306–310, 52 S.Ct. 371, 76 L.Ed. 747, stating the arguments pro and con.

[29] Seymour v. Osborne, 1870, 11 Wall. 516, 533, 20 L.Ed. 33. Cf. United States v. United Shoe Machinery Corp., 1922, 258 U.S. 451, 463, 42 S.Ct. 363, 66 L. Ed. 708; Kendall v. Winsor, 1858, 21 How. 322, 327, 328, 16 L.Ed. 165; Bloomer v. McQuewan, 1852, 14 How. 539, 549, 14 L.Ed. 532, cited with approval in United States v. Univis Lens Co., Inc., May 11, 1942, 62 S.Ct. 1088, 86 L.Ed. ——; Meyers and Lewis, loc. cit., at 125.